The Venable Tobacco Company is a corporation doing business in Durham. J. S. Cobb owned 130 shares and his son, the plaintiff J. O. Cobb, owned 100 shares of the capital stock of said corporation. This stock had been hypothecated to secure a loan from the First National Bank of Durham. The bank failed on or about 18 January, 1932. Thereafter, the receiver of said bank, in an effort to liquidate the assets, was desirous of disposing of said stock, and approached the Standard Investment Company of Durham for the purpose of effecting a sale. The defendant Dibrell Brothers is a corporation, doing business in Danville, Virginia, and was a stockholder of the Venable Tobacco Company. On 8 November, 1932, the Standard Investment Company wrote a letter to Dibrell Brothers stating that the Standard Investment Company had for sale 230 shares of Venable Tobacco Company stock and solicited a bid thereon. In response to said letter Dibrell Brothers wrote, on 9 November, 1932, that it might, "however, be induced to pay $5.00 a share for this stock." Thereupon, the Investment Company agreed to sell the 230 shares to the defendant Dibrell Brothers. However, in closing the transaction the Investment Company found that 100 shares of the stock were not properly endorsed to the First National Bank, and on 18 November, 1932, advised Dibrell Brothers of that fact. The said defendant advised that it could not accept the certificates unless properly endorsed. Thereafter, the Investment Company forwarded to the defendant Dibrell Brothers 130 shares of said stock standing in the name of J. S. Cobb and the attached draft was paid. Subsequently, the defective endorsement for the 100 shares standing in the name of plaintiff J. O. Cobb was corrected and on 7 December, 1932, the Investment Company forwarded to the defendant Dibrell Brothers Certificate No. 8 for 100 shares of said stock, issued in the name of plaintiff J. O. Cobb, and the attached draft was paid.
J. S. Cobb, father of the plaintiff, said at the trial: "I had 130 shares of that stock pledged with the First National Bank against our loan. The stock was sold without my knowledge. . . . I found out Dibrell Brothers had bought it. I called up Colonel Carrington and told him . . . that I would like to have the stock back, that is, 130 shares. He said, `All right.'. . . He told me Dibrell Brothers had paid $5.00 a share for it. He agreed to sell it to me for the same price. The stock was delivered to the bank. . . . I found out just after this stock had been delivered to me that it also bought 100 shares belonging to James (plaintiff J. O. Cobb); so I called Colonel Carrington and told him the stock was sold without his knowledge and that we would like to have it back. He said, all right, we could have it back. *Page 574 
He stated that Dibrell Brothers paid the same for it they did for mine. . . . As soon as I found out that they got this stock I called him right away. I don't think that 100 shares of stock had been delivered to Dibrell Brothers, Inc., at the time I called Colonel Carrington. I am not sure at all when they bought it. . . . I told Colonel Carrington that the 100 shares of stock belonged to my son, James O. Cobb. . . . I told him when I called him it was Jim's stock. Colonel Carrington said he could have the 100 shares of stock back. I mean by that . . . that he could have it back just as I got mine back, at the price he bought it at. By he I mean Jimmie (plaintiff J. O. Cobb). All the correspondence I remember with Dibrell Brothers, Inc., through any of its officers regarding the 100 shares of stock was writing to Colonel Carrington and thanking him for letting us have the stock." On 1 December, 1932, Dibrell Brothers wrote J. S. Cobb in part as follows: "We suggest, however, in order to get it out of their hands to allow them to forward it to us, and we in turn will be glad to let you have it back," etc. J. S. Cobb, replying to said letter, stated: "I am turning your letter over to my son, J. O. Cobb, and he will write you how he prefers to handle same," etc.
On 7 August, 1933, J. S. Cobb wrote a letter to Dibrell Brothers in part as follows: "I am advised by my son, James O. Cobb, that you have until the present time refused to deliver to him the 100 shares of stock of Venable Tobacco Company at $5.00. . . . You must remember the agreement which we had to the effect that you would let us have the stock upon payment of the sum of $5.00 per share, with accrued interest, which represented the cost to you under the terms of your bid to Standard Investment Company. One hundred and thirty shares was for me and the remaining 100 shares was for my son, James O. Cobb. I know that you understood this at the time we were discussing the matter. . . . Therefore, I am writing to request that in keeping with the terms of your agreement that you deliver the stock to my son or forward same to me so that I may deliver it to him," etc.
The record shows that when the foregoing letter was identified by counsel for the plaintiff, and that Mr. J. S. Cobb testified that the signature was in his handwriting, the defendant objected. The objection was overruled and exception taken. Thereafter the letter was offered in evidence by the plaintiff and no objection to the letter itself or its contents appears in the record. The witness J. S. Cobb further testified on cross-examination that Colonel Carrington, of defendant Dibrell Brothers, stated in a telephone conversation that "James (plaintiff J. O. Cobb) could have it, plus interest. . . . He agreed to let Jim and not me have the stock for $5.00, the 100 shares. I was not asking it for myself. I was asking him to let James have it back. *Page 575 
He said he would, and I told him it was James' when I called him. If it had been mine it would have come back with the 130 shares."
The plaintiff J. O. Cobb testified, without objection: "My father was acting as my agent and negotiated with Dibrell Brothers Inc., for the purchase of 100 shares of stock that had previously stood upon the books of Venable Tobacco Company in my name. My father told me of the conversation that he had with Colonel Carrington regarding this stock. He told me he talked to him over telephone and Colonel Carrington agreed to let me have the stock back."
Several letters appear in the record written by the parties, and finally, on 8 July, 1933, the defendant Dibrell Brothers wrote to the plaintiff J. O. Cobb, stating in substance that they would not deliver the 100 shares of stock to the plaintiff at $5.00 per share for the reason, among others, that at the time they made the agreement with J. S. Cobb, father of the plaintiff, for the purchase of the stock the company was of the opinion that their contract to sell was with the father exclusively, and that, therefore, they had made no offer to sell the stock to the plaintiff except upon condition that the plaintiff would pay to the Venable Tobacco Company a certain sum which he owed to that corporation.
Thereafter, the plaintiff brought the present suit against the defendants, setting out the contract and requesting specific performance thereof, or in the event that specific performance could not be had, that the plaintiff recover damages for the value of said stock. The defendant Dibrell Brothers filed an answer denying the contract as alleged by the plaintiff, and alleging that it did not deal with J. S. Cobb as agent for the plaintiff, and that the agreement was without consideration.
At the trial the defendant Dibrell Brothers stipulated in open court "that if the issues are answered in favor of plaintiff that it is ready, able, and willing to make delivery of the stock in question."
The following issues were submitted to the jury:
1. "Did the defendant Dibrell Brothers, Inc., contract and agree to sell and deliver to the plaintiff J. O. Cobb one hundred shares of common stock of the Venable Tobacco Company at five dollars per share, and accrued interest at the rate of 6 per cent per annum from 8 December, 1932, as alleged in the complaint?"
2. "If so, did the defendant Dibrell Brothers, Inc., breach said contract?"
3. "If so, was the plaintiff, at the time of said breach and within a reasonable time after said agreement, ready, able, and willing to comply with the terms of said contract?"
4. "Is the plaintiff entitled to have said one hundred shares of common stock of the Venable Tobacco Company delivered to him by the defendant Dibrell Brothers, Inc., upon the payment of five dollars per *Page 576 
share, and accrued interest at the rate of 6 per cent per annum from 8 December, 1932, as alleged in the complaint?"
The jury answered all of the issues "Yes," and from judgment upon the verdict the defendant Dibrell Brothers appealed.
The chief questions of law presented for solution are as follows:
1. Was there any competent evidence of a valid contract of sale of the shares of stock in controversy to the plaintiff?
2. Was such contract abandoned or relinquished?
3. Did the trial judge correctly instruct the jury?
It is familiar learning that offer and acceptance are the essential elements of a valid contract of sale. The offer must be complete, communicated and accepted in its exact terms. Rucker v. Sanders,182 N.C. 607, 109 S.E. 857; Overall Co. v. Holmes, 186 N.C. 428,119 S.E. 817; Gravel Co. v. Casualty Co., 191 N.C. 313, 131 S.E. 754;Dodds v. Trust Co., 205 N.C. 153, 170 S.E. 652.
Manifestly there was sufficient evidence of a valid contract of sale to be considered by a jury. Conceding that the defendant Dibrell Brothers thought at the time that they were dealing with the father, nevertheless his testimony was unequivocal that positive notice was given that he was dealing for his son, the plaintiff in this action. Moreover, a contract does not result from what either party thought about the transaction, but rather upon what both parties agreed. Brunhild v. Freeman, 77 N.C. 128;Building Co. v. Greensboro, 190 N.C. 501, 130 S.E. 200; McCain v. Ins.Co., 190 N.C. 549, 130 S.E. 186.
The defendant excepted to the introduction of a letter written by J. S. Cobb to the defendant Dibrell Brothers, dated 7 August, 1933, in which Cobb recites the agreement between the parties. Of course, this letter, perhaps, contains certain assertions favorable to plaintiff's theory of the case, but manifestly portions of the letter were competent as corroborating evidence. It is the duty of a party objecting to evidence which is competent for some purposes but not for all, to point the objection at the time it is taken and to request the court to properly restrict it.Barnhardt v. Smith, 86 N.C. 473; Smiley v. Pearce, 98 N.C. 185,3 S.E. 631; Dunn v. Lumber Co., 172 N.C. 129, 90 S.E. 18; Singleton v.Roebuck, 178 N.C. 201, 100 S.E. 313.
There was no evidence that the contract had been abandoned in accordance with any of the recognized and accepted methods pointed out in Bixler v.Britton, 192 N.C. 199, 134 S.E. 488. *Page 577 
The defendant excepted to a certain instruction given the jury by the trial judge to the effect that an agent may bind his principal and the other contracting party without disclosing the fact of agency. This instruction was pertinent to a contention made by the appealing defendant that it was under the impression it was dealing with the father, J. S. Cobb, and not the plaintiff J. O. Cobb. The applicable principle of law was tersely stated in Williams v. Honeycutt, 176 N.C. 102, 96 S.E. 730, as follows: "The right of a principal to maintain an action to enforce a contract made by his agent in his own name without disclosing the name of the principal is well settled."
There are other exceptions in the record, but the Court is of the opinion that none of them warrant the overthrow of the judgment.
Affirmed.